UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:12-CT-3193-F

| | |
|---|---|
| ISRAEL BEN-LEVI, <br> a/k/a Danny L. Loren, <br>     Plaintiff, <br> v. <br> CHAPLAIN BETTY BROWN, <br>     Defendant. | **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT BROWN** <br><br> Fed. R. Civ. P. 56 |

Pursuant to Local Civil Rule 7.2, Defendant Betty Brown, ("Defendant Brown"), having moved for summary judgment, support the motion with the memorandum contained herein with affidavits, and with exhibits, submitted in support thereof.

## STATEMENT OF THE CASE

In the interests of brevity, and given the multiple filings which have occurred in this case, Defendant Brown incorporates by reference, pursuant to Fed. R. Civ. P. 10(c), the Statement of the Case set forth in their last pleading, Defendant's Second Motion for Extension of Time in Which to File Dispositive Motion (Docket Entry ("D.E.") 39), which was filed with the Court on 16 July 2014 and granted by the Court on 17 July 2014 (D.E.40).

Defendant Brown has filed her motion for summary judgment regarding Plaintiff's surviving claim and the memorandum contained herein with affidavits and exhibits supports her motion.

1

## STATEMENT OF FACTS

**Plaintiff's allegations:**

The facts in the light most favorable to the Plaintiff, without qualification, but limited to his one (1) remaining claim[1], relative to inmate-led Jewish Bible study, are as follows:

In 2012, Plaintiff was housed at Hoke Correctional Institution ("Hoke"). (D.E. 1 at 2). Plaintiff alleges that Chaplain Brown, as Director of Chaplaincy Services, refused to authorize Plaintiff access to a quiet room at Hoke for Jewish Bible study, despite inmates practicing other faiths being afforded similar privileges at Hoke[2]. (D.E. 1 at 3-4.) Plaintiff contends that this is a violation of the First Amendment of the United States Constitution. (D.E. 1 at 4.) Plaintiff attached numerous documents to his complaint, one of which being a letter to Defendant Brown asking her if she has "the authority to let the Superintendent [at Hoke] Approve A quiet place, as do all other religions here… to have a Jewish Bible Study, as there are two of us here." (D.E. 1-1 at 4.) On 6 June 2012, Plaintiff filed Grievance No. 4320-120-330, where Plaintiff requested a quiet place to practice and study his religious belief. (See Affidavit of Lynn C. Summers attached to the motion herein).

<u>Relief:</u>

Since Plaintiff is no longer at Hoke, his claims with respect to declaratory and injunctive

---

[1] On 19 March 2014 the court granted Defendant Brown's motion in part and dismissed the claims under RLUIPA. (D.E. 33 at 6.) The only remaining claim, as the motion was denied in part without prejudice, is whether the prison policy violated Plaintiff's First Amendment rights. (D.E. 33 at 4.) Therefore, Plaintiff was allowed to proceed to the extent that he sought monetary damages pursuant to § 1983. (D.E. 33 at 6.)

[2] Plaintiff is a prisoner in the custody of the North Carolina Department of Public Safety ("NCDPS"), currently housed at Wake Correctional Center, and is serving a life sentence for rape in the first degree and assault. (See Exhibit A). This document is available to the public via the internet by searching for Israel Ben Levi's, a/k/a Danny L. Loren, name at http://www.doc.state.nc.us/offenders. This Court may take judicial notice of information of public record when such information can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. FED. R. EVID. 201.

2

Case 5:12-ct-03193-F   Document 43   Filed 09/02/14   Page 2 of 16

relief under RLUIPA were dismissed by this Court. (D.E. 33.) Therefore, Plaintiff seeks that Chaplain Betty Brown pay Plaintiff 1.5 million dollars for violation of his U.S. Constitutional Rights. (D.E. 1 ¶ 5.)

**Defendant's Summary Judgment Materials:**

Defendant Brown's Answer to the complaint [D.E. 34], and documents/exhibits submitted in support of her motion to dismiss, [D.E. 24-1, 24-2, 24-3], should also be considered as part of the record in support of the motion herein. Additionally, Defendant Brown relies on her Affidavits (Brown Aff.) and the Affidavit of Lynn C. Summers ( Summers Aff.), and the documents attached thereto. Plaintiff has submitted various documents regarding his claim with his Complaint [D.E. 1 ], which should be considered part of the pleadings in this matter and considered during summary judgment.

"Jewish Bible study", known as a Torah/Talmud study

In response to Plaintiff's requests for an inmate-led Jewish Bible study in a quiet room, or a Torah/Talmud study[3], it should be noted that Plaintiff's request, since it's not relative to formal Jewish worship services, may be waived in a prison setting when led by a Rabbi. (See North Carolina Department of Correction Religious Practices Resource Guide and Reference Manual; section III (B), filed as (D.E. 24-2 at 3.)). The policy allows for private worship, or corporate worship, which requires 10 adult Jews. (*Id*.) Other types of worship services, however, may be waived in a prison setting when led by a Rabbi. *(Id.)* The Rabbi requirement serves a number of compelling governmental interests: ensuring the purity of the doctrinal message and teaching, and promoting institutional security and it also ensures that the groups and services are not co-opted by outside influences (e.g. White Supremacists or other groups) which might use it

---

[3] What plaintiff incorrectly identifies as a Jewish Bible study is correctly known as a Torah/ or Talmud study. See Brown Aff. ¶ 20.

to mask their illicit activities. (Brown Aff. ¶'s 26, 20-23, see also ¶¶11-12 .) The policy also ensures that no one inmate assumes a position of power and authority vis-a-vis another and conserves personnel resources. (*Id*. ¶ 26 and see also¶ 22.) NCDPS was aware that the federal courts, including those in North Carolina, had upheld religious volunteer requirements as serving some of these same compelling governmental interests. (*Id*. ¶ 27.)

Furthermore, during the recognition process of Judaism, NCDPS investigated its tenets, consulted with outside experts, requested guidance from other state departments of correction, secured information regarding legal requirements and formulated a policy setting forth the parameters of its practice and promulgated the same. (Brown Aff. ¶¶ 20, 23-26, 28 ) The policy established permitted private worship, and corporate worship, including providing an exception to the 10 adult Jews requirement as long as the practice is lead by a Rabbi (*Id*. ¶14); and may permit approved Torah/or Talmud study, "Jewish Bible study," when led by a "qualified teacher [e.g. Rabbi]." (*Id*. ¶ 14 and ¶ 20.) Before approving the policy, NCDPS consulted with an outside Rabbinical authority to determine the tenets of the faith practice, the requirements of the faith practice, and how best to accommodate those practices without endangering the health and safety of staff or other inmates, without interrupting prisons operations and without squandering monetary or personnel resources. (*Id*. ¶23, ¶24 and see also ¶ 20.)

## ARGUMENT

**Summary Judgment Standards:**

As the movant for summary judgment, Defendant Brown must show that she is entitled to such judgment as a matter of law. Rule 56(a) of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as

4

to any material fact and the movant is entitled to judgment as a matter of law." The movant has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Rule 56(c)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Additionally,

> the burden on the moving party may be discharged by showing -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case. [R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the [summary judgment] motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.

*Carr v. Deeds*, 453 F.3d 593, 608 (4th Cir. W. Va. 2006) (internal quotations omitted).

In responding to a motion for summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting former Rule 56(e)). Further, an apparent dispute of fact, or issue, is "genuine" only when "the nonmovant's version is supported by sufficient evidence to permit a reasonable jury to find in the nonmovant's favor." *Sylvia Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995) (internal quotation marks and citation omitted). "[T]he plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify *affirmative evidence* from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (emphasis added). Thus, a nonmoving party who relies on "mere belief or

5

conjecture, or the allegations and denials contained in his pleadings," cannot avoid summary judgment. *Celotex Corp.*, 477 U.S. at 324. Additionally, "[i]t is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club,* 346 F.3d 514, 526 (4th Cir. 2003) (*reversed, in part, on other grounds*).

In this case, Plaintiff has not and cannot present evidence sufficient to permit reasonable jurors to find in his favor. Accordingly, summary judgment should be granted in Defendant Brown's favor, dismissing Plaintiff's claim.

**First Amendment Standards:**

Under 42 U.S.C. §1983, an inmate may bring a civil suit against prison officials who cause or participate in a violation of their rights secured by the United States Constitution or other federal law. *West v. Atkins*, 487 U.S. 42, 49, 101 L. Ed. 2d 40 (1988). In a First Amendment, free exercise of religion challenge, the relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The United States Supreme Court enunciated the factors that form this reasonableness inquiry: (1) whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) what impact accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison, and on the allocation of prison resources; and (4) whether there are ready alternatives to the prison regulation. *Turner*, 482 U.S. at 89-90, *accord O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349-350 (1987).

These rights include an inmate's right to the First Amendment's Free Exercise Clause, guaranteeing that every individual, including inmates, has the right to freely exercise his religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 96 L. Ed. 2d 282 (1987).  However, in light of the difficulties of prison administration, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration" when considering policies that may result in a restriction of an inmate's free exercise rights.  *O'Lone*, 482 U.S. at 349-50.  This deference is achieved in part through application of a reasonableness test that is less restrictive than the test ordinarily applied to alleged infringements of fundamental constitutional rights. *Lovelace v. Lee*, 472 F.3d 174 at 199-200 (4th Cir. 2006); see also *O'Lone*, 482 U.S. at 349.  Thus, the First Amendment affords less protection to an inmate's free-exercise rights than does RLUIPA because the First Amendment adopts a less stringent standard of review than that used in RLUIPA claims: reasonableness instead of strict scrutiny.  *Id.*  A prison regulation that abridges inmates' constitutional rights is "valid if it is reasonably related to legitimate penological interests." *Lovelace*, 472 F.3d 174 at 200.

Additionally, to have a successful claim, a plaintiff has a responsibility in a First Amendment Constitutional case to provide defendant information on how his requested activity is associated with the practice of his chosen religion. *See Desper v. Lee*, 2011 U.S. Dist. LEXIS 121330 (W.D. Va. 2011) (Copy attached hereto as Exhibit B).  In *Desper*, an inmate who followed the Seventh-Day Adventist religion, then an unrecognized faith practice in Virginia, claimed that prison officials violated his constitutional rights by assigning him clean-up duty on Saturday mornings, which he claimed to be Sabbath. *Id.* at *14.  The court dismissed Plaintiff's

7

claim and found that the "sparse factual allegations [by the plaintiff] do not indicate that he, at any time, explained to the defendants in any detail the specific tenets of his religious beliefs or how any of the challenged jail policies substantially burdened those beliefs." *Id.*

**Overlap of the RLUIPA and the First Amendment:**

As stated, RLUIPA imposes a more searching standard, strict scrutiny; on review of free exercise burdens imposed by prison administrators than does the First Amendment, reasonableness. *Lovelace*, 472 F.3d at 186. However, the initial burden on the inmate is the same under both RLUIPA and the First Amendment, i.e., to show that his right to free exercise of religion has been substantially burdened. *Brown v. Ray*, 695 F. Supp. 2d 292, 300 (W.D. Va. 2010). Hereafter, it is supposed that if Plaintiffs have failed to plead a violation of RLUIPA they have likewise failed to plead a violation of their First Amendment right to Free Exercise.

In the instant case, this Court held that Defendant failed to adequately address, in her memorandum in support of her motion to dismiss (D.E. 24), the issue whether Defendant's actions substantially burden Plaintiff's religious exercise and whether Defendant's action are reasonably related to legitimate penological interest. (D.E. 33 at 4 ¶ 3.) First, Plaintiff contends that Defendant Brown alleged failure to provide him a quiet room at Hoke for "Jewish Bible Study," (D.E.1), amounts to a violation of his First Amendment right to free religious exercise. However, Plaintiff has failed to offer any evidence, through affidavits or otherwise, demonstrating what tenets central to his practice of Judaism are related to the "Jewish Bible study." Plaintiff has also failed to show how Defendant Brown actions have burdened his ability to practice his faith or caused Plaintiff to violate the tenets of his belief. Indeed, even though Plaintiff is required at this point to have more than his pleadings, even Plaintiff's allegations

8

against Defendant Brown are devoid of explanation. Plaintiff calls his request a "Jewish Bible study," when it appears that he has sought a quiet room for a "Torah/Talmud study." (Brown Aff. ¶¶ 12 fn. 2, and 20). Thus, it is important to note that the language Plaintiff uses in his "complaint [and grievance] exhibits that he is not knowledgeable to teach or guide others in the Jewish faith." (Brown Aff. ¶ 20). Moreover, as established by the policy, Plaintiff can engage in other practices, for example, private and corporate worship. In addition, Plaintiff can seek an approval for a Rabbi led "Jewish Bible study" or the Torah/Talmud study. (Brown Aff. ¶¶ 14, 20, 28). Furthermore, "Jewish Bible study" or the Torah/Talmud study are conducted by "qualified teacher [e.g. rabbi] or, in pairs of study partners… supervised by a qualified teacher… Somebody who is not qualified would not be permitted to lead Torah study in the community because it is so complex." (Brown Aff. ¶ 20.) Thus, Plaintiff does not establish how a the denial of an inmate-led "Jewish Bible study", Torah/Talmud study, in a quiet area, substantially burdens his religious practice. Therefore, Plaintiff has failed to provide a material fact as to how Defendant Brown's alleged actions affected his religious practices.

However, even if Plaintiff had shown that his ability to practice his religion was substantially burdened, Defendant Brown has effectively demonstrated through her affidavit that she followed NCDPS' policies and procedures related to Jewish worship practices, and furthermore that the policies and procedures are reasonably related to a legitimate penological interest. It should be noted that the policy does not prevent the Plaintiff from having an approved "Torah/Talmud study" or "Jewish Bible study." However, the policy does require that it be "led by a Rabbi." (Brown Aff. ¶¶ 14, 20, 24-26); see also the North Carolina Department of Correction Religious Practice Resource Guide and Reference Manual ("RPM") section (III) (2) (D.E. 24-2 at 3)).

9

Rabbi Requirement

The Rabbi requirement serves a number of compelling government needs, primary among them institutional and individual security. Prison officials "should be granted wide-ranging deference in the adoption and execution of policies that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *In Re the Long Term Segregation of Inmates Designated as Five Percenters*, 174 F3d 464, 469 (4th Cir. 1999). Prisons have long grappled with wholesale hijacking of religious worship by outside groups to serve their ulterior motives. (Brown Aff. ¶¶ 21 and 26) (describing infiltration of Messianic Jewish groups within NCDPS by White Supremacists and discussing the problems generally).[4] For this reason alone, the Courts have held that a volunteer requirement either does not substantially burden the exercise of religious rights, or it is the least restrictive means of protecting the vital government interest in prison safety and security. *See Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (holding an outside volunteer requirement does not place a substantial burden on an inmate's religious exercise); *Griffith v. Bird*, 2009 U.S. Dist LEXIS 104469, at *11-12 (W.D.N.C. Nov. 3, 2009) (copy already provided in (D.E. 24-4.)). (North Carolina requirement requiring a chaplain or an approved volunteer to oversee religious gatherings was rationally related to the legitimate governmental interest of institutional security and order, particularly where adherent was free to practice worship individually at any time and allowing inmates to conduct religious services without volunteers would adversely impact of prison personnel and other inmates.) Furthermore, not only does the Rabbi serves to promote institutional security and ensure that groups services are not co-opted by gangs or other groups

---

[4] The infiltration of religious groups by outsiders also informs to the penological objective and interests set out Chaplain Brown's Affidavit. (Brown Aff. ¶¶ 21 and 26 .)

10

which might use it to mask their illicit activities, but absent outside nefarious influences, it also ensures that no one inmate assumes a position of power and authority vis-à-vis another. (Brown Aff. ¶ 26). The Rabbi, or "qualified teacher," is noted by the faith itself.

> [a] Torah/Talmud study…is usually either conducted in a school ['Cheder', "Yeshiva', etc] class led by a qualified teacher [e.g. rabbi] or, in pairs of study partners ['Chavrusa'] supervised by a qualified teacher. In any case, somebody who is not qualified would not be permitted to lead Torah study in the community because it is so complex.

(Brown Aff. ¶ 20). Thus, the Rabbi requirement also ensures the purity of the doctrinal message and teachings. (Brown Aff. ¶ 26). Lastly, it conserves personnel resources. Therefore, the policy is reasonably related to legitimate penological interests. (Brown Aff. ¶ 22.)

Here, Jewish inmates have other alternatives, available to them including the following: corporate worship, freedom to worship individually, enrollment in religious correspondence courses, and also at the inmates' request-the admission of clergy and other spiritual advisors subject to DOP policies, and inmate may request a community religious official to perform a religious rites/rituals subject to DOP policies. (Brown Aff. ¶¶ 6-10.) Chaplaincy is always looking to secure additional volunteers; however, because the numbers of declared Judaism followers is small, there are fewer available volunteers than for other religions recognized by the NCDPS. (*Id.* ¶ 28.) Moreover, the policy does not prevent the Plaintiff from seeking, and requesting approval for a volunteer Rabbi to conduct the Jewish Bible study, or Torah/Talmud study. (*Id.* ¶ 28.)

Further, "while a prisoner does not forfeit his constitutional right to equal protection by

11

the fact he has been convicted of a crime and imprisoned, prisoner's claims under the equal protection clause ... must still be analyzed in light of the special security and management concerns in the prison system." *Morrison v. Garraghty*, 239 F. 3d 648, 655 (4th Cir. 2001), (citing *Jones v. North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119, 136 (1977) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.")); See also *Turner-Bey v. Maynard*, 2012 U.S. Dist. LEXIS 133862, 44-46 (D. Md. Sept. 18, 2012). (Copy attached hereto as Exhibit C.) (upholding distinctions in the diet provided to Jewish and Muslim inmates). Here, any complaint that Plaintiff may have regarding an alleged difference in treatment of Jewish inmates versus other religious groups, Plaintiff has not demonstrated an abuse of discretion and Defendant Brown has offered explanation for the policies which were enacted regarding Judaism. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). Additionally, Defendant Brown has stated that some faith practices may require corporate group worships, others may not, and those that do not require corporate worship will have observance of special days led by **an approved volunteer**. (Brown Aff. ¶ 16.) Furthermore, Plaintiff has not offered "proof that a discriminatory purpose has been a motivating factor" for the restrictions of the policy. *Salaam v. Collins*, 830 F. Supp. 853, 857-858 (D. Md. 1993). As a result, this claim must fail.

**Qualified Immunity:**

In the interest of time and to avoid repetition, Defendant Brown will re-assert the qualified immunity defenses in her Answer (D.E. 34) and legal arguments in the Memorandum in Support of Defendant Brown's Motion to Dismiss, [D.E. 24 at 11-13], and will supplement

with the following discussion:

> Even if there was evidence that Defendant Brown, did not providing a quiet room at Hoke for Plaintiff to conduct inmate-led "Jewish Bible study" or Torah/Talmud study, was in fact burdening Plaintiff's ability to practice his religion, Plaintiff has failed to show, through affirmative evidence, that Defendant Brown *intentionally* violated Plaintiff's constitutional rights. As a result, she is entitled to qualified immunity and Plaintiff's only claim requires dismissal. *See Griffith v. Bird,* 2009 U.S. Dist. LEXIS 104469, *6 (W.D.N.C. 2009) *aff'd*, 410 Fed. Appx. 713 (4th Cir. 2011) (copy already provided in (D.E. 24-4.)). The Fourth Circuit Court of Appeals has found that, in order for an inmate to recover for alleged violations of their Free Exercise rights under 42 U.S.C. §1983, inmates "must assert conscious or intentional interference" with those rights and that "negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause." *Lovelace*, 472 F.3d at 201.
>
> Likewise, in the context of cases regarding the violation of an inmate's right to practice his religion, where an inmate has failed to provide prison officials with information regarding his faith practice, courts have been reluctant to find an intentional deprivation of inmates" free exercise rights by those officials. *See Blount v. Ray*, 2010 U.S. Dist. LEXIS 80471 (W.D. Va. 2010). (Copy attached hereto as Exhibit D). In *Blount,* an inmate claimed that he practiced the religion of the House of Yaweh, then an unrecognized religious practice in Virginia, and that prison officials had violated his constitutional rights by not allowing him to participate in Ramadan in the manner in which he desired. *Id.* at *6. The court reasoned, however, that the inmate had failed to provide officials with sufficient information regarding the tenets of the House of Yaweh or the sincerity of his beliefs in the House of Yaweh. *Id.* The court stated,

13

"Defendants who have not been provided evidence of an inmate's sincere, religious belief that requires him to participate in specific religious practices cannot be said to **intentionally deprive** the inmate of accommodation of those practices." (emphasis supplied). *Id. (*citing *Lovelace*, 472 F.3d at 199).

In the present case, Plaintiff does not come forward with any evidence that Defendant Brown intentionally violated his religious rights or that he informed Defendant Brown of the specific tenets of his faith and how the lack of a "Jewish Bible study," Torah/Talmud study, caused him to violate said tenets. No evidence in this case indicates that there was any intentional action by Defendant Brown that rises to the level required to make a constitutional allegation. On the contrary, Defendant Brown's affidavit evidenced her efforts in providing guidance and assistance, and her dedication to determine religious practices, their tenets and requirements, and how best to accommodate these practices in a prison setting. At the same time, balancing institutional security concerns as well as budgetary and personnel constraints. Thus, Defendant Brown is entitled to the protection of qualified immunity against Plaintiff's claims. Therefore, Defendant is entitled to summary judgment in her favor as to Plaintiff's claims against her.

## CONCLUSION

For the above and foregoing reasons, this Court ought to grant Defendant Brown summary judgment.

14

Case 5:12-ct-03193-F   Document 43   Filed 09/02/14   Page 14 of 16

Respectfully submitted, this the 2nd day of September, 2014.

ROY COOPER
Attorney General

/s/ Judith M. Estevez
Judith M. Estevez
Assistant Attorney General
N.C. State Bar No. 45218
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone:   (919) 716-6500
Fax:              (919) 716-6761
E-Mail:         jestevez@ncdoj.gov
Local Civil Rule 83.1 Counsel
Attorney for Defendant Brown

15

## CERTIFICATE OF SERVICE

I hereby certify that on 2nd September 2014 I electronically filed the **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT BROWN**, with supporting affidavits, exhibits, and case law, with the Clerk of the Court using the CM/ECF system and mailed a copy to the Plaintiff:

> Israel Ben-Levi
> a/k/a Danny L. Loren
> OPUS No. 0248366
> Wake Correctional Center
> 1000 Rock Quarry Road
> Raleigh, NC 27610

This the 2nd day of September, 2014.

/s/ Judith M. Estevez
Judith M. Estevez
Assistant Attorney General
N.C. State Bar No. 45218
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6500
Fax: (919) 716-6761
E-Mail: jestevez@ncdoj.gov
Local Civil Rule 83.1 Counsel
Attorney for Defendant Brown